UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

I.B. and Z.B., individually and on behalf of B.B.,

       Plaintiffs,

    -v-                            No.15-CV-01309-LTS

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

       Defendant.

-------------------------------------------------------x

<u>OPINION AND ORDER</u>

APPEARANCES:

| SKYER, CASTRO, FOLEY & GERSTEN | NEW YORK CITY LAW DEPARTMENT |
|---|---|
| By: Gregory Cangiano | By: William Beecher Soville, Jr. |
| 276 5th Avenue | 100 Church Street |
| New York, NY 10001 | New York, NY 10007 |
| *Attorneys for Plaintiffs* | *Attorneys for Defendant* |

LAURA TAYLOR SWAIN, United States District Judge

Plaintiff B.B. is the minor child of I.B. and Z.B. (the "Parents"), and has been classified by the Defendant New York Department of Education ("Defendant" or the "DOE") as a child with a disability under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and corresponding New York law.  On February 24, 2015, the Parents filed suit in this Court, seeking review and reversal of a determination by a State Review Officer that the individualized education program created for B.B. by the DOE for the year 2012 to 2013 provided a free appropriate public education, as required by the IDEA.  The Parents seek reimbursement of B.B.'s expenses for special education and related services for the year 2012 to 2013, during which period the Parents unilaterally placed B.B. in a general education program in a private school.[1]

Before the Court now are the parties' cross-motions for summary judgment.[2]  The Court has jurisdiction of the action under 18 U.S.C. §§ 1331 and 1367.

The Court has carefully considered the submissions of both parties, along with the underlying administrative record.  For the following reasons, the Parents' motion for summary judgment is granted and the Defendant's motion for summary judgment is denied.

---

[1]     The Parents do not seek reimbursement of tuition for the general education component of the private school program.  (See SRO Decision at 1; Pl. Br. at 5 n.4; DOE Br. at 3-4.)

[2]     "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]."  M.H. v. New York City Dep't of Educ., 685 F.3d 217, 226 (2d Cir. 2012) (internal quotation marks and citation omitted, alterations in original).

A.

<u>BACKGROUND</u>

I.        <u>IDEA Statutory Framework</u>

A state receiving federal funds under the IDEA must provide disabled children with a free appropriate public education ("FAPE").  <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 192 (2d Cir. 2005) (citing 20 U.S.C. § 1412(a)(i)(A)).  To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each such child.  <u>R.E. v. New York City Dep't of Educ.</u>, 694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d)).  The IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  <u>Id.</u> (internal quotation marks and citation omitted).  The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits."  <u>Id.</u>

Because New York receives federal funds under the IDEA, it must comply with the requirements of the statute.  <u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 123 (2d Cir. 1998).  New York has assigned responsibility for developing IEPs to local Committees on Special Education ("CSEs").  <u>R.E.</u>, 694 F.3d at 175 (citations omitted).  CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others.  (<u>Id.</u> (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)).  The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program.  <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 107-108 (2d Cir.

2007).  New York state regulations require a school district to conduct a functional behavioral assessment ("FBA") for a student who exhibits behavior that impedes learning, and to develop a behavioral intervention plan ("BIP") to address that behavior.  T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 152 (2d Cir. 2014) (citing 8 NYCRR §§ 200.4(b)(1)(v), 200.22(b)).

    If a parent believes that his child's IEP does not comply with the IDEA, the parent may file an administrative challenge, known as a "due process complaint," with the appropriate state agency.  See 20 U.S.C. § 1415(b)(6).  In such cases, the IDEA mandates that states provide "impartial due process hearings" before "impartial hearing officers" ("IHOs").  Id. §1415(f); see also N.Y. Educ. Law § 4404(1).  Either party may appeal the IHO's decision to the state review officer ("SRO"), who may affirm or modify the IHO's order.  N.Y. Educ. Law § 4404(2).  Either party may then bring a civil action in state or federal court to review the SRO's decision.  20 U.S.C. § 1415(i)(2)(A).  On appeal from an SRO determination, Plaintiffs have the burden of demonstrating that the SRO erred.  See M.H., 685 F.3d at 225 n.3.[3]  "[B]asing its decision on the preponderance of the evidence," the district court "shall grant such relief as [it] determines is appropriate."  T.M. ex rel. A.M., 752 F.3d at 152 (citing 20 U.S.C. § 1415(i)(2)(C)(iii)).

---

[3] As the Second Circuit has noted, the Supreme Court has concluded that the IDEA placed the burden of challenging an IEP on the party bringing the challenge but has left unanswered the question of whether states could "override the default rule and put the burden always on the school district," as New York has done.  See M.H., 685 F.3d at 225 n.3 (citing Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 57-78 (2005)).  However, here, as in M.H., the Court need not resolve this issue, because the SRO concluded that the IEP was proper and "the burden of demonstrating that the respective Review Officers erred is properly understood to fall on the plaintiffs."  Id.

While the review process is pending, parents may unilaterally place their child in a private school and then seek retroactive tuition reimbursement from the local school district. 20 U.S.C. § 1412(a)(10)(C).  Under the three-part Burlington/Carter test,[4] the parents will be entitled to reimbursement if (1) the school district's proposed placement violated the IDEA, (2) the parent's alternative private placement was appropriate, and (3) equitable considerations favor reimbursement.  T.M. ex rel. A.M., 752 F.3d at 152 (citation omitted).  Under New York's Education Law Section 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at the due process hearing.  R.E., 694 F.3d at 184.  If the board fails to carry this burden, the parents bear the burden of demonstrating that their alternative private placement was appropriate, i.e., that it was "reasonably calculated to enable the child to receive educational benefits."  S.B. v. New York City Dep't of Educ., No. 14 CV 0349, 2015 WL 3919116, at *2 (S.D.N.Y. 2015) (citations omitted).  Finally, the parents are also required to show that the equities favor reimbursement, an analysis that focuses on whether the parents obstructed or were uncooperative in the school district's efforts to meet its IDEA obligations. See R.E., 694 F.3d at 184.

II.        Factual Background[5]

B.B. was born in 2004, and is now about 12 years old.  (Ex. 1 at 1.)  B.B. began receiving special education services beginning at 19 months of age.  (Tr. 295.)  According to his

---

[4]        See Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993) (parents entitled to reimbursement only if federal court concludes public placement violated IDEA and private placement was proper; court is to consider all factors in fashioning equitable relief); Sch. Comm. of Town of Burlington v. Dep't of Educ., 471 U.S. 349 (1985) (parents may be reimbursed for private special education if court ultimately determines private placement was proper).

[5]        The facts are drawn from and the citations are to the administrative record.

mother, once play group teachers observed that he would wander off, "tantrum" and easily

become frustrated in a group setting, B.B. started receiving Special Education Itinerant Teacher

("SEIT") services, where a SEIT works with a child with special needs in a one-on-one capacity,

under the auspices of the DOE Committee on Preschool Special Education.  (See id. 296.)  B.B.

initially started with a couple of hours of SEIT services per week.  (Id.)  The services were later

increased to ten weekly hours, and then in 2008, to thirty weekly hours.  (Id.)  Around 2008,

B.B. was diagnosed with Pervasive Developmental Disorder - No Origin Specified ("PDD-

NOS") and, around 2009, he was diagnosed with Attention Deficit Disorder ("ADD").  (Id. 284.)

He also suffers from involuntary ticks or facial and/or hand movements.  (Id. 284, 344.)  By the

2011-2012 school year, B.B. was receiving 25 hours of SEIT services per week, which is the

level that he currently receives.  (Id. 18, 297.)  It appears that an August 2008 IEP calling for this

level of SEIT services and certain related services was the last one on which the DOE and the

Parents agreed.  (Id. 19.)  A impartial hearing process resulted in an order in July 2010 that

mandated the 25 hours of SEIT services and related services; certain of the related services were

undisputed.  (Id. 16.)  At B.B.'s current school, Mirrer Yeshiva, in Brooklyn, he receives three

SEIT service components—for Hebrew classes, general education classes and at home.  (Id. 115,

213, 215.)

       An IEP dated June 17, 2011, classified B.B. as autistic and recommended a 12-

month first grade program in a specialized DOE school with related services and a student-to-

teacher-to-paraprofessional ratio of 6:1:1.  (Ex. 2 at 2.)  It appears that there was no agreement

on the suitability of this IEP, and B.B. spent his first grade year at Mirrer Yeshiva in a 27-student

general education classroom, receiving 25 hours of SEIT services along with the related

occupational, physical and language therapy services for a 12-month school year program,

apparently based on the August 28, 2008, IEP and the 2010 order.  (See Ex. A at 1-2; Ex. 3; Tr. 14, 100-101, 104.)

*2012-2013 CSE Meeting and IEP*

        B.B. was seven years old, and completing the first grade at Mirrer Yeshiva, at the time of the March 23, 2012, annual IEP review meeting of the CSE, which was convened by the DOE and developed the disputed 2012-2013 IEP.  (Ex. 1 at 1, 16.)  The meeting attendees were Ben Shu (special education teacher and district representative), Chaya Karpensprung (B.B.'s general education teacher at Mirrer Yeshiva), I.B. (B.B.'s mother), Debra Greif (parent member), Brocha Epstein (B.B.'s SEIT at Mirrer Yeshiva), Junithe Lanie (a DOE school psychologist), and Baila Steinman (B.B.'s occupational therapist).  The documents reviewed at the meeting included a March 5, 2012, psycho-educational evaluation report written by Ms. Lanie (Ex. 2), a progress reports written by speech therapist Yehuda Fommell, dated February 23, 2012 (Ex. J), a progress report written by Ms. Epstein, dated February 28, 2012 (Ex. H), a progress report written by Baila Steinman, dated February 24, 2012 (Ex. I), a progress report written by Ms. Karpensprung (Ex. G), and a March 14, 2012, classroom observation report written by Mr. Shu (Ex. 3).  The psycho-educational evaluation report stated that an IEP dated June 17, 2011, recommended a 12-month special class in a specialized school with related services, and that previously a staff of ratio of 6:1:1 was recommended and a classification of autism was given.  (Ex. 2 at 2.)  The report noted, inter alia, that in 2004, a pediatric neurologist reported that B.B. demonstrated speech, social and behavioral difficulties associated with some PDD-NOS features.  (Ex. 2 at 5.)  The report further noted that in 2008, a prescription note

written by a doctor indicated that B.B. presented with symptoms of PDD,[6] and that B.B.'s

mother indicated that B.B. had been seen by a neurologist in the past, who had "informally

mentioned" that he may be autistic.  (Id.)  The report noted that B.B.'s mother indicated that

B.B. takes focalin, an ADHD medication.  (Id.)

    The report also documented the results of a Gilliam Autism Rating Scale (GARS)

evaluation that Ms. Laine conducted, which were "reflective of a student very likely to be

autistic."  (Id.)  According to the report, GARS is an instrument that is used to "help identify

children with autism from children with other severe behavioral problems."  (Id.)  B.B. received

a score of 19, which corresponds to an autism score of 76; scores between 70 and 84 indicate

that a child "may possibly have Autism."  (Id.)  The report's summary section includes

observations that B.B. "has difficulties with paying attention in class and following instructions.

He made some progress however, he continues to struggle academically.  [B.B.] does not keep

pace with instruction.  There are some social emotional issues that need to be address [sic] in

school.  He is not able to follow directions and complete work within a given amount of time

without adult supervision.  He has trouble completing assignments."  (Id. at 5-6.)

    The classroom observation report, which was also considered by the CSE, noted

that B.B. related appropriately to the teachers, and was respectful and compliant.  (Ex. 3.)  It

stated that "[f]rom time to time during their independent work on reading and math worksheets,

Ms. Epstein gave him prompts and directions."  (Id.)  The report noted that B.B. readily followed

corrections by his teachers, his attention was "average" and that he did not have interactions with

his classmates.  (Id.)

---

[6]  Ms. Laine had the doctor's note at the time she prepared the psycho-educational
evaluation report.  (Tr. 55.)

The resulting IEP for 2012-2013 incorporates many of the same conclusions, describing B.B.'s "levels of performance and individual needs" as follows:

> [B.B.] has difficulties with paying attention in the class and following instructions. He has made some progress however, he continues to struggle academically. [B.B.] does not keep pace with instruction. There are some social emotional issues that need to be address [sic] in school. He is not able to follow directions and complete work within a given period of time without adult supervision. He has trouble completing his assignments. According to teacher's school progress report "With loads of one on one help [B.B.] was finally able to understand the concept of addition and subtraction. He can add and subtract using fingers and prompts. He has trouble counting past 20. His reading level is good. [B.B.] is currently decoding at grade level. His comprehension skills needs improvement. [sic] At times he demonstrates understanding when he is focused and prompted. [B.B.] gets frustrated easily. With the help of his SEIT provider he is working at persevering at task." [sic] On the Wechsler Intelligence Scale for Children - fourth Edition (WISC IV) [B.B.] earned a Full Scale Index of 70 which places him in Borderline range of overall cognitive functioning, respectively, and is ranked at the 2nd percentile. On the Verbal Comprehension Index he yielded a Composite score of 81 which places him in the Low Average range and is ranked at the 10th percentile. The Perceptual Reasoning Index yielded a score of 67 Extremely Low range; 1st percentile. On Working Memory Index [B.B.] yielded a Composite score of 88 which places him in the Average range; 21st percentile. The Processing Speed Index yielded a score of 68 which places his in the Extremely Low range; 2nd percentile. On the reading composite [B.B.] yielded Standard Scores within the below average range. His overall reading skills are approximately at a kindergarten-first grade level. The Word Reading subtest (SS=83) he was able to read words such as in, to, my, they and when. [B.B.] was unable to read don't, shop, him, and stone. His phonemic awareness skills are his strength. His overall math skills are approximately a pre-kindergarten-kindergarten grade level. His is able to identify groups of numbers and the number. He is not able to recognize add nor subtract and identify ordering numerals. [B.B.] is weak is adding and subtracting objects, completing number patterns and interpreting graphs.

(Ex. 1 at 1.) The IEP classified B.B. as having a "speech or language impairment" and recommended him for a special education classroom of no more than twelve students with one special education teacher and one paraprofessional teaching assistant in a DOE public school that enrolls both disabled and non-disabled children, a setting also known as 12:1:1 special class in a community school. (Id. at 1, 9, 12.) The program further recommended related services of

four one-on-one speech/language therapy sessions per week, three one-on-one occupational

therapy sessions per week, a single one-on-one physical therapy session per week, and a single

one-on-one session and a single group session of counseling per week.  (Id. at 9.)  The annual

goals set forth in the IEP included "[c]ounseling: Within one year, [B.B.] will follow a

classroom routine with minumal [sic] verbal promtps [sic]."  (Id. at 4.)  Finally, the program was

recommended to be implemented over a 10-month (September to June) school year.  (Ex. 1 at

10.)

*IHO Hearing*

        According to the Parents, they repeatedly requested information as to the specific

school to which B.B. would be assigned but did not receive such information prior to the end of

the first grade school year and therefore were unable to visit and assess the proposed school

while it was in regular operation.  (See Tr. 399-401; Ex. F.)  On July 9, 2012, the Parents re-

enrolled B.B. at Mirrer Yeshiva and filed a due process complaint for an impartial hearing before

an IHO.  (Ex. A.)  On July 10, 2012, the DOE sent the Parents a final notice of recommendation

proposing PS-199 in Brooklyn as the school that would implement B.B.'s program.  (Ex. 4.)  In

their due process complaint, the Parents principally contended that the DOE had failed to offer a

FAPE to B.B. because he was inappropriately given a classification of speech and language

impairment, rather than autism, and that he continued to require a 12-month school term and 25

hours per week of one-on-one SEIT services in a general education classroom, rather than

placement in a specialized classroom with a 12:1:1 staffing ratio.  (Id.)

        The IHO conducted the impartial hearing on various dates between August 8,

2012, and March 17, 2013.  (IHO Decision at 3-4.)  On August 31, 2012, the IHO issued an

interim order, ordering the DOE to continue funding the prior SEIT and various therapy services for B.B. during the pendency of the dispute, including: 25 hours weekly of SEIT services, one-on-one occupational therapy twice per month, one-on-one speech and language therapy four times a month, and physical therapy once a month. (Order on Pendency, Aug. 31, 2012.) The DOE continues to fund these services pursuant to the pendency order.

At the impartial hearing, the DOE presented two witnesses: Ms. Laine, the school psychologist who had prepared the psycho-educational evaluation report, and Christina Kushner, Special Education Teacher for the DOE-designated school, PS-199. Ms. Laine is employed with the DOE's Committee on Special Education Region 7. (Tr. 31.) One of her responsibilities in that position is to administer psycho-educational examinations for a child who may be or is special needs. (Id. 31-32.) Ms. Laine was questioned regarding her psycho-educational report on B.B. and the classification change. With respect to the dispute regarding classification, Ms. Laine testified that she recalled that, at the CSE meeting, B.B.'s mother had stated that she was not sure if B.B. was autistic. (Id. 39.) When asked whether her psycho-educational evaluation assessed for autism, Ms. Laine responded that she had administered the GARS, which she explained was "an instrument that pretty much identifies children with autism or other severe behavioral programs, but it is not something that you could diagnose a child with." (See id. 40.) When asked by DOE counsel whether the data revealed by the GARS was "statistically significant to classify [B.B.] with autism," Ms. Laine responded "[n]o, not to my knowledge." (Id. 40.) Ms. Laine, however, later admitted that the result of the GARS indicated that B.B. is very likely to be autistic. (Id. 54 (Q: And doesn't [the psycho-educational evaluation] indicate that the results of the GARS was reflective of the student is very likely to be autistic? A: That's right.").)

Ms. Laine also admitted that she had a record of a prescription for PDD-NOS while she developed her psycho-educational report.  (Id. 55.)  Ms. Laine observed, however, that the prescription was three years old at the time of her evaluation, that she believed young children make developmental progress over such a period of time, and that her report indicated that B.B. had "made progress throughout the years."  (Id. 70-71.)  Ms. Laine further testified that her findings of speech and language impairment were supported by her testing results on verbal comprehension cognitive testing, which were indicative of language processing issues, and low reading comprehension scores.  (Id. 40-42.)  As to her assessment of B.B.'s social and emotional functioning, Ms. Laine testified:

> Well, I see [B.B.], when I had evaluated him, he lacked focusing and sustained attention.  He was unable to sustain attention.  I had to redirect him.  I also referred to his inability to understand directions, was also a problem along with poor fine motor skills.  So there were many tasks I wasn't able to complete . . . .  he just has a lot -- he had speech difficulties, demonstrating difficulty in areas of behavior.

(Id. Tr. 43.)  Ms. Laine also testified that B.B. was respectful, amicable, loving and friendly during her evaluation of him, and that she would not use those words to describe an autistic child.  (Id. 44.)

Ms. Laine was also asked about the provision of one-to-one SEIT services:

> Q:     What is your opinion on [B.B.] receiving SEIT services as a child in the first grade?
> A:     Well, in my opinion, what do I believe about a SEIT in the first grade?  [Objection]
> . . .
> A:     Very restrictive.  He was in a classroom, I believe it was a big classroom.  Socially and emotionally it doesn't fare [sic] with him because he's been isolated.  When you're talking about the least restrictive environment, he's extremely restricted from participating in the classroom.  And he really doesn't - - I don't think he really needs it.

With respect to the appropriate length of the school year, Ms. Laine

acknowledged that B.B.'s SEIT, general education teacher and parent had indicated at the CSE meeting that he required a 12-month school year in order to make progress.  (Id. 61.)[7]  Ms. Laine testified that one-on-one support for B.B. was not considered at the meeting.  (Id. 64.)  Although Ms. Laine testified that she recalled a discussion of "other programs" (id. 69), she acknowledged that the space on the IEP form for specification of other programs that had been considered by the CSE had been left blank (id. 59).  Ms. Laine testified that she believed the IEP could provide B.B. with a free appropriate education for the 2012-2013 school year.  (Id. 47.)

The DOE's other witness, Ms. Kushner, Special Education Teacher at PS-199, testified that B.B. would have attended a 12:1:1 class, and that the classification of the students in that class would have been learning disability and speech and language impairment, with functional reading and math levels ranging from kindergarten to Grade 3.  (Id. 77, 85.)  She testified that no one in the class into which B.B. would have been placed at PS-199 is classified with autism.  (Id. 87.)  She also testified that she reviewed B.B.'s IEP, that B.B.'s IEP is similar to the IEPs of other children in the 12:1:1 class, and that the teacher would have been able to meet the goals stated in the IEP.  (Id. 80, 84.)  Ms. Kushner admitted, however, that she did not know B.B., and she did not explain the specific means by which the PS-199 12:1:1 setting would have achieved B.B.'s specific goals.  (Id. 87; see generally id. 75-92.)

The Parents presented several witnesses, including B.B.'s general education teacher, SEIT, occupational therapist, and B.B.'s mother.  B.B.'s general education teacher at his current school Mirrer Yeshiva, Ms. Karpensprung, testified as to B.B.'s existing education

---

[7]        Q: Isn't it true that [B.B.]'s SEIT and Parent and teacher indicated that he required a 12-month program in order to make progress?  A: I don't recall them stating otherwise.

conditions and the role his SEIT plays in the classroom. She testified that she believed that it was appropriate for B.B. to receive SEIT services in her classroom over the 2011-2012 school year, and that "I thought that [B.B.] did beautifully, could not have done it without her [the SEIT]. At the beginning of the year before [the SEIT] had started, I could not fathom – I could not understand how I'm going to get through the year with him. That was before she started. At the end of the year, he was one of the guys." (Id. 104; see also id. 133.) Ms. Karpensprung testified that, although B.B. did not have any wild behavioral outbursts in class, he got frustrated very easily and had attentional issues. (Id. 121, 123, 133.) She testified that Ms. Epstein, B.B.'s SEIT in the classroom, worked with B.B. three hours every day, four days a week, for a total of 12 hours per week. (Id. 115.) Ms. Epstein would, for instance, prompt B.B. to handle reading one line at a time when he got frustrated, and sometimes would take him out of the classroom to a private setting. (Id. 124.) Ms. Karpensprung testified that she would "be afraid to let him go without the SEIT" because B.B. would still get frustrated and nervous about certain new concepts. (See id. 134.) In addition, Ms. Karpensprung testified that the mainstream environment was "wonderful" for B.B. because, for example, he would watch everyone else doing a lengthy math worksheet, realize it was the norm and "work[] with it." (Id. 105.) Ms. Karpensprung testified that, at B.B.'s IEP meeting, she had stated that he should continue with the services he had been receiving. (Id. 107.)

Brocha Epstein had been working with B.B. for approximately two years as his SEIT in the general classroom. (Id. 202.) She has bachelor's and master's degrees in Special Education and is finishing a master's degree in School Administration. (Id. 144-45.) She is trained in Applied Behavior Analysis ("ABA") therapy, and has advanced training in reading remedies and behavior skills. (Id.) Ms. Epstein testified in detail, inter alia, as to B.B.'s

educational difficulties, the way in which SEIT services helped support B.B. in those difficulties,

and B.B.'s risk of regression.  Ms. Epstein testified that B.B. has trouble in all areas and the

speech and language impairment classification was too "narrow":

> He needs help following the class routines, understanding what's been taught,
> adhering to the routines.  He needs help with behavioral needs, with social skills.
> He needs help in comprehension.  He needs help transitioning.  He needs help
> with his expressive language skills, his receptive language.  He needs redirection
> to attend to what's being taught and – to continue to complete his work.

(Id. 149-50; see also id. 333-43.)

She testified that the receipt of SEIT services was the option that "gives [B.B.] the

support he needs in order to be a student."  (Id. 189.)  She testified that B.B. has difficulty

following directions (id. 336) and that, when B.B. gets frustrated, his first instinct is to shut

down (id. 190-91.)  As a SEIT, Ms. Epstein uses prompts and positive reinforcement, which has

helped B.B. progress with dealing with his frustration.  (See id.)  She testified that she redirects

B.B. using verbal cues, token incentives, or tapping on the desk, gradually decreasing the

number of prompts as B.B. progresses, and has seen tremendous progress utilizing this method.

(See id. 154-56.)  She testified that at B.B.'s CSE meeting, she had recommended that the SEIT

services for B.B. continue.  (Id. 193-94.)  According to Ms. Epstein, the IEP's recommendation

of a classroom with 12 students, one teacher, and one paraprofessional would not be sufficient to

maintain an educational benefit for B.B. because "a teacher's attention is divided up into so

many bits, it's highly unlikely that the support that the - - that he or she would be able to give

B.B. the support that he needs."  (Id. 366, 340.)  Ms. Epstein further explained that, without one-

on-one support, B.B. demonstrates "spinning behaviors" for instance, and involuntary ticks.  (Id.

344.)

She testified that she disagreed with the IEP recommendations for the 2012-2013

school year, and that she had recommended that B.B. continue receiving SEIT services.  (Id.
359.)  Ms. Epstein further testified that B.B. responds well to a mainstream environment, with
the support of a SEIT, because he is motivated by seeing everyone else working and wants to do
what everyone else is doing.  (Id. 168, 192, 335.)   She testified that, "once [B.B.'s] peers are
focused on the teacher or the work they're doing, it's not a distraction because I find that he
responds well and he's usually willing to work harder when he's in the classroom and he's doing
work like everybody else."  (Id. 168).  She also testified that B.B. "answers questions in class.
He plays with the other boys at recess, and they've even asked him if, you know, he wants to
play . . . . Because he's where he is, that's a big motivator for him."  (Id. 169.)  Ms. Epstein
testified that she did not believe a 12:1:1 class would be an appropriate setting for B.B. because
he would be placed in a class with students with different kinds of issues and would not be
motivated to adhere.  (See id. 169, 193-94.)

    Ms. Epstein also testified to B.B.'s issues with retention.  She explained that she
works together with B.B.'s mother, and his other SEITs and service providers to reinforce and
follow through at school and at home what is being taught because he has difficulties retaining
and attending to the work.  (Id. 163.)  She sends target examples of math problems for his
mother and SEITs to work on at home because he needs the reinforcement.  (Id. 185.)  She
testified that, in her progress report (Ex. H), she made the recommendation for 12-month service
to prevent regression because she has seen that, when B.B. has a break from school, he
experiences regression.  (Tr. 196.)  She stated that his regression over a week-long break or a
few days would not be that severe but, if the break were over the span of a summer, the
regression would be greater.  (Id.)  In her written progress report to the CSE, Ms. Epstein had
stated: "[t]welve month services are recommended to prevent regression.  [B.B.] can learn with

help but each achievement is like conquering Everest.  It would impede [B.B.'s] progress if he would have to start from scratch in September."  (Ex. H.)

        B.B.'s mother, I.B., also testified as to B.B.'s need for one-on-one support and his risk of regression.  She testified that, in addition to speech and language issues, B.B. has attention and focusing issues, as well as difficulty with social behavior.  (Id. 376-77.)  She testified that she, and all of B.B.'s therapists, disagreed with the classification of speech and language impairment because it was too narrow given B.B.'s issues.  (Id. 392.)

        I.B. testified that she believed that B.B.'s goals need to be consistently sustained across school, home and different environments.  (Id. 372.)  She stated that B.B. needs to have structure to his day, very clear directions with clear consequences and that, without structured engagement, B.B. is not productive and does not do what he is supposed to.  (Id. 373-74.)  According to I.B., B.B. needs carryover from school to home in order to succeed, including the support of a SEIT after school to enable him to do his homework.  (Id.)  She testified that he has made tremendous progress since the beginning of the 2012-2013 school year.  (Id. 382.)  She characterized his attentional skills as much better than they were, but stated that it is still a struggle for him to stay on task; when he is engaged properly, and he has the right structure, he is able to complete tasks.  (Id. 291-92.)  She testified that, without the structure that a SEIT can provide, there is a "tremendous possibility" that there will be regression.  (See id. 373.)

        I.B. also testified that a mainstream classroom is appropriate for B.B. because he is socially motivated to please based on what everyone else is doing around him, and he needs typically developing children around him to be able to act appropriately.  (Id. 384.)  She testified that she felt that the 12:1:1 special class would not be an environment in which he could succeed because it would be too restrictive, since he would be in a self-contained class without any

opportunities to be with other children who are developing typically.  (Id. 396.)  She testified

that modeling is very important for him, and that he keeps himself in check in a general

education setting with typically developing children.  (Id. 304.)

       Regarding the length of the school term, I.B. testified that there was significant

discussion at the CSE meeting regarding a 10-month versus 12-month program and that B.B.'s

SEITs and therapists had verbally disagreed with the 10-month program and had provided

examples of the consequences of a lengthy hiatus.  (Id. 398.)  She testified that the DOE

representatives did not provide a justification for why the 10-month program would be

appropriate, but instead simply said that she should believe in her child and that he did not

necessarily need all of the support.  (Id.)  She stated that, when B.B. does not have a SEIT over

the weekend, there is regression.  (Id. 373.)

       Ms. Baila Steinman, B.B.'s occupational therapist, also testified.  Ms. Steinman

discussed the propriety of SEIT services and his risk of regression.  She testified that B.B.

"needs help staying focused.  That's number one.  He definitely needs help with a novel type of

worksheet . . . he needs probably repeated directions with those things."  (Id. 259.)  She testified

that the SEIT gave him direction and orientation since B.B. has issues with focusing and tracking

things on a page.  (Id. 309.)  According to Ms. Steinman, prompting from the SEIT, and looking

at what the rest of the class doing, helps B.B. stay focused.  (See id.)  She also testified that the

SEIT facilitates improvement in B.B.'s social skills through role play and assisting with

comprehension of games.  (Id. 312.)  She testified that the after-school component of the SEIT

services allows for drilling and repetition, without which they cannot continue to build the

foundation that B.B. needs.  (Id. 314.)

       With respect to the appropriate duration of the program, Ms. Steinman testified

that B.B. "has to have" a 12-month program because:

> [M]emory seems to be a big thing with him.  So, if I would know over the
> summer that he is going to forget all the math he ever learned, because we worked
> so hard on it, then I would say we'll be setting him back a year.  Secondly, it's
> hard to work on certain skills, let's say social skills . . . in a classroom setting . . .
> in the summer they are more relaxed and it is easier for them to learn new
> skills . . . a child like this can't be let go for – he can be – he can't be on his own
> for two months without input.

(Id. 276-77.)


*IHO Decision*

On March 28, 2013, the IHO issued her findings of fact and decision in favor of

the DOE, finding that the recommended program was "reasonably calculated to enable the

student to receive educational benefits."  (IHO Decision at 12.)   The IHO, without citing any

specific part of the record, concluded that the change in classification from autism to speech and

language impairment was supported by the record, and that the 12:1:1 special class "would have

provided the personalized instruction and support services that student required to benefit

educationally from that instruction."  (Id. at 10.)  The IHO pointed out that the parent and

providers had been given a full opportunity to participate in the meeting and to express their

opinions  (id. at 11-12), but she did not address the objections that those individuals had made to

the components of the IEP (see id. at 12.)  The IHO also found, without articulating any specific

analysis of the testimony or other record evidence pertaining to B.B., that the IEP was

reasonably calculated to enable B.B. to receive educational benefits.  (Id. at 11-12.)  The IHO

concluded that:

> The record establishes that a validly constituted IEP team considered recent
> testing, evaluations and teacher and provider input before making
> recommendations for the student.  The recommendation for a change in

classification from autism to speech and language impairment was supported by the results of the evaluations and the entire record before me.  The team considered the information provided by the student's parent, teacher and providers and determined, based on all of the testing, observations, reports and discussion, that speech and language impairment was the appropriate classification.  They then determined that a 12:1:1 class with related services was a program reasonably calculated to meet the student's needs in the least restrictive environment.  I concur.

(Id. at 11-12.)


*SRO Decision*

        The Parents appealed the IHO Decision to the Office of State Review of the New York State Education Department, arguing that the IEP was both procedurally and substantively deficient.  On October 28, 2014, the SRO issued her decision, finding that the program recommended for B.B. was appropriate and that the DOE therefore had offered B.B. a FAPE, and dismissed the Parents' appeal.  (SRO Decision at 14.)  With respect to the Parents' procedural challenge that the March 2012 CSE failed to conduct a FBA of B.B., an objection that was not addressed by the IHO Decision, the SRO found that the evidence in the hearing record did not support a finding that the student's attention needs and behavior impeded his learning or that of others such that a FBA was required.  (SRO Decision at 12.)  In support of that conclusion, the SRO cited, inter alia, the school psychologist's testimony that B.B. did not exhibit any overt behaviors that would interfere with his ability to receive an educational benefit (Tr. 69-70), and other parts of the record which reflected that, although B.B. became frustrated with new concepts, he was calm and happy when his daily routine was consistent and that "praise, encouragement, refocusing, redirection, and being given tasks in increments" addressed B.B.'s problems with attention and frustration.  (Id.)

The SRO also cited record evidence that B.B. had poor verbal skills to demonstrate that the IHO was correct in finding that the CSE's decision to change B.B.'s eligibility classification from autism to speech or language impairment was supported by the results of the evaluations and the entire hearing record.  (Id. at 8.)

With respect to the recommended 10-month program, the SRO noted that the Parents and the SEIT had testified that, at the March 2012 CSE meeting, B.B.'s service providers disagreed with the 10-month program and provided "some real examples as to what would happen if [B.B.] [did not] remain in a 12-month program and how difficult it would be for [B.B] to start the school year." (Id. at 13 (citing Tr. 397-98).)  The SRO also noted that the Parents testified that a 12-month school year was recommended by all of the student's therapists (id. (citing Tr. 398)) and that B.B.'s occupational therapist testified that B.B. "ha[d] to have a 12 month program." (Id. (citing Tr. 276.))  However, the SRO pointed out that the SEIT could not recall whether she had provided her recommendations for a 12-month school year program to the March 2012 CSE and that the occupational therapist could not recall whether a 12-month program was discussed at the March 2012 CSE meeting. (Id.)  The SRO also observed that, contrary to the Parents' assertions, it was only the SEIT's February 2012 progress report, and not all of the progress reports, that made a 12-month school year recommendation. (Id.)  The SRO further stated that, although the February 2012 progress report asserted that a 12-month school year was required in order to "prevent regression" and that the student's progress would be "impede[d]" if he had to "start from scratch in September," the progress report did not provide any further explanation to support those statements. (Id. (citing Ex. H at 2).)  The SRO concluded that, "[w]ithout additional evidence, the SEIT's recommendation in the February 2012 progress report is not sufficient to establish that the student required a 12-month school

year program to prevent substantial regression.  Therefore, the hearing record demonstrates that the March 2012 CSE's failure to recommend a 12-month school year program did not result in a failure to offer the student a FAPE for the 2012-13 school year."  (Id. at 13-14.)

On February 24, 2015, the Parents filed a Complaint in this Court against the DOE, asserting three claims: denial of a FAPE in violation of the IDEA; denial of rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and denial of rights under New York State law.  Both parties have moved for summary judgment: the Parents seek educational funding for the SEIT and related services for the 2012-2013 school year and reimbursement of the attorney's fees and costs that have incurred from the impartial hearing forward;[8] the DOE seeks denial of the Parents' motion and dismissal of the Complaint.

B.

DISCUSSION

I.          Standard of Review

The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education."  T.K. v. N.Y.C. Dep't of Educ., No. 14 CV 3078, slip. op. at 10 (2d Cir. Jan. 20, 2016) (citing 20 U.S.C. § 1400(d)(1)(A)).  The Second Circuit recently held that, "[i]n practice, this means that States have an affirmative obligation to provide a basic floor of opportunity for all children with disabilities, or as we recently described it, an

---

[8]          Although the DOE has paid for the services pursuant to the Order on Pendency, resolution of the question of the provision of a FAPE and the propriety of the services that have been continued is necessary, as the interim order requires the DOE to continue to fund the services until the parties' dispute relating to the 2012-2013 school year is resolved.  (See DOE Br. at 4.)

education likely to produce progress, not regression, and one that affords the student with an opportunity greater than mere trivial advancement." Id. (internal quotation marks and citation omitted). A FAPE "must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." Frank G. v. Bd. of Educ. of Hyde Park., 459 F.3d 356, 363 (2d Cir. 2006) (internal quotation marks and citations omitted).

It is well established that "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo, 489 F.3d at 112 (internal quotation marks omitted). Courts "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,'" id. (citation omitted); but such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review," R.C. ex rel. M.C. v. Byram Hills Sch. Dist., 906 F. Supp. 2d 256, 267 (S.D.N.Y. 2012) (citation omitted). Rather, a court must give "due weight" to the administrative proceedings. Gagliardo, 489 F.3d at 113 (internal quotation marks omitted). Administrative determinations based on "substantially greater familiarity with the evidence and the witnesses," or regarding substantive adequacy and "an appropriate educational methodology" should be afforded more weight than determinations regarding whether the IEP was developed according to the proper procedure. See M.H., 685 F.3d at 244. Similarly, "[d]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." Id. (citations omitted). Of course, however, if the conclusions of the hearing and review officers are unsupported by the record as a whole, are incorrect as a matter of law, or fail to take into account important information, the

Court need not afford deference.  See Mr. X v. New York State Educ. Dep't, 975 F. Supp. 546, 558 (S.D.N.Y. 1997); see also R.E., 649 F.3d at 189; M.H., 685 F.3d at 244.  In other words, the deference owed to an SRO's decision depends on the quality of that opinion.  R.E., 694 F.3d at 189.  Reviewing courts must look to factors that "normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."  M.H., 685 F.3d at 244.  "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not."  Id.  The reviewing Court may consider evidence developed during the administrative proceedings, along with any additional evidence presented by the parties.  20 U.S.C. § 1415(i)(2)(C); J.W. v. New York City Dep't of Educ., 95 F. Supp. 3d 592, 600 (S.D.N.Y. 2015) ("[U]nder the IDEA, a district court must conduct an independent review of the administrative records, along with additional evidence presented by the parties, and must determine by a preponderance of the evidence whether the IDEA's provisions have been met.") (internal quotation marks and citations omitted).

As explained above, parents challenging the adequacy of an IEP may seek retroactive tuition reimbursement from the local school district pending resolution of the dispute.  20 U.S.C. § 1412(a)(10)(C).  Under the three-part Burlington/Carter test, the parents will be entitled to reimbursement if (1) the school district's proposed placement violated the IDEA, (2) the parent's alternative private placement was appropriate, and (3) equitable considerations favor reimbursement.  T.M. ex rel. A.M., 752 F.3d at 152 (citation omitted).  Subject to limited exceptions, the same considerations and criteria that apply in determining whether a school district's placement is appropriate should be considered in determining the appropriateness of

the parents' placement.  See Frank G., 459 F.3d at 364.[9]

The "IDEA established a two-part inquiry for courts reviewing [state] administrative determinations" regarding the provision of a FAPE.  See R.C., 906 F. Supp. 2d at 267-68 (citation omitted).  First, the court examines whether "the State complied with the procedures set forth in the Act," and second, the court determines whether the IEP "developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits."  Id.  A finding of substantive inadequacy automatically entitles the parents to reimbursement.  R.E., 694 F.3d at 190.  A procedural error will only render an IEP legally inadequate if the alleged inadequacies "(i) impeded the child's right to a [FAPE]; (ii) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a [FAPE] to the parents' child; or (iii) caused a deprivation of benefits."  R.C., 906 F. Supp. 2d at 268 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

II.        Adequacy of the IEP

a.    Procedural Issues

The Parents argue that the failure of the CSE to conduct an FBA, and the failure to develop a BIP, were procedural errors that deprived B.B. of a FAPE.

New York state regulations require a school district to conduct an FBA for a

---

[9]      The Parents argue that their reimbursement request should not be subjected to scrutiny pursuant to the Burlington/Carter formula because they are not seeking funding for the general education component of the Yeshiva program but, rather, seek only funding for special education support services.  While the issues to be a considered in connection with their reimbursement request are arguably narrower than those arising from a request to fund the entirety of a private-setting academic program, the question of whether the particular components sought to be funded are appropriate are fundamentally the same, and the Court finds no reason to depart from the Burlington/Carter analytical construct.

student who exhibits behavior that impedes learning, and to develop a BIP to address that

behavior.  T.M. ex rel. A.M., 752 F.3d at 169 (citing 8 NYCRR §§ 200.4(b)(1)(v), 200.22(b));

see also C.F. ex rel. R.F. v. New York City Dep't of Educ., 746 F.3d 68, 80 (2d Cir. 2014)

("even under New York law, assessments are only required 'as necessary to ascertain the

physical, mental, behavioral and emotional factors which contribute to the suspected

disabilities") (quoting 8 NYCRR § 200.4(b)(1)(v) (emphasis in original)).  The Second Circuit

has held that, where such analysis is required, "[t]he failure to conduct an adequate FBA is a

serious procedural violation because it may prevent the CSE from obtaining necessary

information about the student's behaviors, leading to their being addressed in the IEP

inadequately or not at all."  R.E., 694 F.3d at 190.  "[T]he failure to conduct an FBA will not

always rise to a denial of a FAPE," but it does call for particular care in the determination of

whether the IEP adequately addresses the student's problem behaviors.  Id.

    Here, it is undisputed that an FBA was not conducted, but the Court defers to the

SRO's reasoned conclusion that an FBA was not required.  The SRO cited record evidence

demonstrating that B.B. did not exhibit any overt behaviors that interfered with his ability to

receive educational benefit, and that he did not disrupt the learning of others.  (See SRO

Decision at 12.)  Cf. T.M. ex rel. A.M., 752 F.3d at 169 (SRO's finding that an FBA was not

required under the circumstances was "precisely the type of issue upon which the IDEA requires

deference to the expertise of administrative officers.")  The record indicates that, while B.B.

certainly experienced frustration in class, he did not express that frustration by acting out to

disturb students around him.  (See, e.g., Tr. 121-23.)  There is no evidence, other than the

inherent impediments presented by his learning disabilities, to suggest that B.B. displayed any

conduct that would interfere with his ability to receive an educational benefit (when he was

supported in the appropriate way); the record demonstrates, instead, that he is motivated by the positive behavior of others.  (See, e.g., Ex. 1; Ex. 3; Tr. 44, 123, 384.)  Although the evidence indicated that the SEIT employed Applied Behavioral Analysis instructional methods in addressing B.B.'s attentional and other difficulties in the classroom setting, the SRO's informed assessment that B.B. did not display the type of behaviors that warranted an FBA is entitled to deference on this record.  See, e.g., T.M. ex rel. A.M., 752 F.3d at 169 (finding that characteristics of "distractibility, inattentiveness and difficult remaining on-task, non-contextual vocalizations, finger twirling [did not] impede [the student's] learning or that of others."); R.E., 694 F.3d at 183, 195 (finding that a history of biting her hands and hitting herself was "not severe enough to warrant an FBA.")

> b.      Substantive Issues

The Parents contend that B.B. was denied a FAPE for the 2012-2013 school year because his classification was improperly changed from autism to speech and language impairment, and because his IEP did not recommend one-on-one SEIT service in a general education classroom or a 12-month school year program.

> (i)      Classification of Disability

As an initial matter, the Court notes that the issue of whether B.B. was incorrectly classified as having a speech and language impairment, while relevant, is not dispositive of the inquiry as to whether a FAPE was provided.  See K.H. v. N.Y.C. Dep't of Educ., No. 12 CV 1680, 2014 U.S. Dist LEXIS 108393, at *65 (E.D.N.Y. Aug. 5, 2014) ("The IDEA mandates services tailored to a child's individual needs, not dictated by a particular diagnosis or classification.").  To the extent, however, that the Parents are arguing that B.B.'s incorrect classification denied him a FAPE because he would not receive the benefit of classroom

resources that are mandated for children classified as having autism, the Court will consider the objection as one directed at the overall suitability of the combination of setting and services called for by the IEP.  (See Pl. Br. at 8; 8 NYCRR § 200.13).  For instance, New York regulations require that any child classified as autistic, if he or she is placed in a program with students with other disabilities or in a regular classroom, should be provided transitional support services by a special education teacher with a background in teaching students with autism in order to assure the student's special education needs are being met.  8 NYCRR § 200.13(a).

        The Court finds that the Parents have not met their burden of demonstrating, by a preponderance of the evidence, that the SRO's conclusion that B.B.'s classification as having a speech or language impairment, rather than as autistic, did not deny him a FAPE was in error. The Parents object to B.B.'s speech or language impairment classification in and of itself as erroneous, but do not specifically object to the denial of the underlying services that would be provided as a result of an autism classification.  And while the Parents do present evidence that the absence of certain other services—such as a one-on-one support or a 12-month school year—deny B.B. a FAPE, they do not argue or present evidence supporting the conclusion that the denial of the mandated services for a child with an autism classification denied B.B. a FAPE. There is no evidence presented that the Parents' own private placement of B.B. in a general education classroom, which the Parents argue has resulted in progress for B.B., is tailored for children for autism or fulfills the requirements laid out by 8 NYCRR § 200.13.  While the record reveals that B.B.'s classification of speech and language impairment may not have captured the full extent of B.B.'s challenges and individual needs, the Parents have not demonstrated by a preponderance of the evidence that B.B., who has never been formally diagnosed as autistic, was denied a FAPE because he was not classified as being autistic and was not offered the services

New York mandates for autistic children.

    The conclusion that a FAPE was not denied because of B.B.'s classification does not moot the separate question of whether the IEP was tailored to meet B.B.'s unique needs and was reasonably calculated to enable him to receive an education likely to produce progress, and not regression.  See Frank G., 459 F.3d at 363; see also F.O. v. New York City Dep't of Educ., 976 F. Supp. 2d 499, 520 (S.D.N.Y. 2013) (the relevant question is not the "label" of "a classroom for children with autism," but rather, whether the IEP proposed an education appropriate for the individual student).  The analysis of whether the IEP was properly tailored to B.B.'s individualized needs is informed by the entirety of his documented learning difficulties, behaviors, and responses to educational modalities, not simply by his technical classification. The Court thus will proceed to examine whether the SRO erred in finding that the IEP's recommendation of a 12:1:1 program and a 10-month school year provided B.B. a FAPE.

    (ii)  Whether the IEP Offered a FAPE

      (A)  12:1:1 Classroom Program

    The IEP prescribed a 12:1:1 classroom setting for B.B., where only two professionals are responsible for support and instruction of 12 special needs students, without the one-on-one supportive services that B.B. had been receiving consistently since he was a toddler. Both the SRO and IHO decisions are deficient in substantive analysis as to why such one-on-one services were not required for B.B., and thus those decisions are entitled to little deference.  The SRO and IHO decisions rely on conclusory assertions that the overall IEP recommendation was sufficient and neither addresses B.B.'s individual educational needs.  There is no explanation of why one-on-one SEIT services would not be required to enable B.B. to achieve an educational benefit when he has a documented inability to pay attention and attend to tasks without a set

structure and individualized adult guidance, and the record demonstrates that B.B. has made progress in an one-on-one support setting.  Rather, the SRO's decision merely proffers a conclusory recitation that "[t]he evidence in the hearing record indicates that the individual student's needs, as described in the March 2012 IEP, could be met in a 12:1+1 special class placement at a community school," along with the related services.  (SRO Decision at 9.)  Such conclusory statements are not entitled to deference.  See F.O., 976 F. Supp. 2d at 514 (conclusions, without citation to evidence, that student's needs were addressed by IEP, "utterly fails to meet the Second Circuit's standard, and does not require deference"); see also M.H., 685 F.3d at 249 ("the SRO . . . did no more than state summarily that the goals 'comprehensively addressed the student's needs in the areas.' . . . The SRO failed to point to contrary evidence he deemed more compelling . . . the SRO's conclusory statement did not evince thorough and well-reasoned analysis that would require deference.")

The record evidence is overwhelming that B.B. required intensive support in focusing on tasks, understanding instructions and following through with completing tasks and retention of material.  The IEP and the psycho-educational reports relied upon by the DOE in formulating its recommendation acknowledged B.B.'s problems with attention and inability to focus on his own, though the IEP does not explain how it proposes to address that problem.  (See Ex. 1 at 1; Ex. 2 at 4-5; Ex. 3.)  The IEP acknowledged that "[h]e is not able to follow directions and complete work within a given period of time without adult supervision."  (Ex. 1 at 1.)  The psycho-educational report drafted by Ms. Laine, the DOE school psychologist, specifically recognized that "[h]e is not able to follow directions and complete work within a given amount of time without adult supervision.  He has trouble completing assignments."  (Ex. 2 at 5-6.)  The DOE's classroom observation report noted that B.B. readily followed corrections by his teacher

and that "[f]rom time to time during their independent work on reading and math worksheets, Ms. Epstein [B.B.'s SEIT] gave him prompts and direction."  (Ex. 3.)

       The testimony of B.B.'s instructors and mother provides powerful evidence of the need for one-on-one classroom support.  B.B.'s general education teacher testified that she could not imagine having B.B. in the classroom without the support of a SEIT but that, under the SEIT's guidance, he progressed significantly and that he could not have done it without the SEIT.  (See Tr. 104.)  B.B.'s mother testified that he is unproductive without structured guidance and regresses without SEIT support.  (Id. 291-92, 373-74.)  Indeed, all of the individuals and teaching professionals who had worked with B.B. in an educational setting who testified affirmed the necessity of one-on-one services for B.B.  Ms. Epstein, B.B.'s SEIT in the general classroom, testified in detail regarding the support given by SEITs when B.B. shuts down from getting frustrated, including positive reinforcement, prompts, and reinforcement at home.   (Id. 190-91.)  She testified to her belief that a classroom with 12 special education students and two teaching professionals would be "highly unlikely" to give B.B. the support he needs to achieve an educational benefit because the teachers' attentions would be too divided.  (See id. 366.)  This belief is supported by the evidence that all 12 students in such a setting would suffer from their own learning disabilities requiring attention, and the fact that, as acknowledged by the special education teacher at PS-199, none of the other students would have been classified as having autism (Tr. 87), a condition of which B.B. displays some symptoms.  There is simply no evidence in the IEP itself or the record that the 12:1:1 setting would have met B.B.'s need for one-on-one support, given the varied capabilities and needs of students in a setting with 12 special needs students and only two professionals.

       The only record support for the notion that B.B. does not require one-on-one

support is in the form of testimony by Ms. Laine, the school psychologist, that (1) one-on-one

support would constitute too restrictive an environment because B.B. would be isolated from the

rest of the class (Tr. 68) and that (2) she d not think B.B. "really needs it" (id.)  Indeed, Ms.

Laine admitted that she did not ever consider one-on-one services as an option for B.B. in

formulating the IEP.  (Id. 64.)  Although Ms. Laine did not elaborate on either of these assertions

in her testimony, the DOE argues here that the records supports her conclusions because there

was testimony that the SEIT sat next to B.B. and guided and helped him in class, and B.B.'s

occupational therapist testified that B.B. does not interact well with his peers.  (DOE Br. 20.)

The DOE urges the Court to conclude that "the record shows that the CSE team had a proper

basis for omitting the related services of one-on-one instruction by a SEIT from the

recommended program."  (Id.)

       The DOE's attempt to refute the overwhelming record in this case is unavailing,

as there is no evidence that the CSE meeting specifically considered the question of need for

one-on-one services at all.  Furthermore, there is no evidence that Ms. Laine's opinion regarding

the supposedly restrictive impact of one-on-one instruction had any basis in evaluation of B.B.'s

needs or actual experience.  Ms. Laine interviewed B.B. outside of a classroom setting and did

not perform any classroom observations herself.  Although Benjamin Shu, who performed a one-

day classroom observation of B.B., reported that B.B. did not interact directly with other

classmates, he did not attribute the behavior to the presence of the SEIT.  Shu also reported that

B.B. engaged in play activities like other children during recesses, and that he had "good eye

contact with his teachers and peers."  (Ex 3.)  The classroom observation report thus provides no

support for Ms. Laine's opinion regarding the social impact of one-on-one classroom support.

By contrast, B.B.'s general educational teacher, his SEIT in his regular classroom, and his

occupational therapist all testified that the support of a SEIT, who by the nature of individualized service delivery must be next to B.B. in the classroom, is necessary to enable B.B. to receive an educational benefit.  (See, e.g., Tr. 104, 107, 154-56, 189, 193-94, 259, 309, 314, 340, 359, 366.)  Rather than isolating him, B.B.'s general education teacher testified, the SEIT helped B.B. with his social skills and, by the end of the school year, B.B. was "one of the guys."  (Tr. 104; see also Tr. 133, 312.)

The DOE's argument that B.B.'s. progress in a general classroom setting proves that he does not require support beyond the 12:1:1 setting has no foundation in the record.  As demonstrated by the record, B.B. received 25 hours of one-on-one SEIT services per week at the Yeshiva and in a general education setting with normally developing peer models, and the testimony makes clear that his progress was in large part attributable to the work of his SEITs.

(B)      10-Month Program Year

New York state regulations require the consideration of twelve-month educational programs as needed "to prevent substantial regression."  8 NYCRR § 200.6(k)(1).  "Substantial regression" is defined as "a student's inability to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year."  8 NYCRR § 200.1(aaa).  With respect to the recommended 10-month program, the SRO noted that B.B.'s mother and the SEIT testified that, at the March 2012 CSE meeting, B.B.'s service providers disagreed with the 10-month program and provided "some real examples as to what would happen if [B.B.] [did not] remain in a 12-month program and how difficult it would be for [B.B] to start the school year."  (Id. at 13 (citing Tr. 397-98).)  The SRO also noted that the Parents testified that a 12-

month school year was recommended by all of the student's therapists and that B.B.'s

occupational therapist had testified that B.B. "ha[d] to have a 12 month program."  (<u>Id.</u> (citing

Tr. 276.))  The SRO further noted that the SEIT's February 2012 progress report recommended a

12-month school year in order to "prevent regression" and to avoid impeding the student's

progress if he "had to start from scratch in September."  (<u>Id.</u> (citing Ex. H at 2).)

   The SRO stated, however, that the February 2012 progress report was the only

progress report that recommended 12-month services and that the report did not provide any

further explanation to support the 12-month recommendation.  (<u>Id.</u> (citing Ex. H at 2).)  Noting

that B.B.'s occupational therapist could not recall whether a 12-month school program was

discussed at the March 2012 CSE meeting, the SRO concluded that "[w]ithout additional

evidence, the SEIT's recommendation in the February 2012 progress report is not sufficient to

establish that the student required a 12-month school year program to prevent substantial

regression.  Therefore, the hearing record demonstrates that the March 2012 CSE's failure to

recommend a 12-month school year program did not result in a failure to offer the student a

FAPE for the 2012-13 school year."  (<u>Id.</u> 13-14.)

   The SRO's narrow focus on her perception of the paucity of the record

established at the CSE meeting is unwarranted, as the question of whether a FAPE has been

provided is determined on the administrative records as a whole.  20 U.S.C. § 1415(i)(2)(C);

<u>J.W.</u>, 95 F. Supp. 3d at 600.  There is substantial evidence in the record, some of which was

acknowledged by the SRO, demonstrating, by a preponderance of the evidence, that B.B. would

suffer substantial regression if he did not receive programming for a 12-month school year.  The

SRO's decision that a 10-month program is sufficient, which ignored the evidence presented at

the hearing before the IHO, was in error and is not entitled to deference.  Even if it were true that

the February 2012 progress report lacked sufficient evidence to demonstrate the need, the entire record contains detailed testimony and specific examples, including testimony from the SEIT who wrote the progress report, explaining why the need for a 12-month program exists.

B.B.'s SEIT, Ms. Epstein, and his occupational therapist, Ms. Steinman, both attested to B.B's troubles with memory and retention of information, and the need for a integrated and repeated approach.  (See, e.g., Ex. H; Tr. 163, 185, 196, 276-77.)  For instance, Ms. Epstein testified that B.B. regresses, though not severely, over a week long break or even a few days, but that the regression would be greater if it were over an entire summer.  (See Tr. 196.)  In her report, Ms. Epstein puts the point even more finely, stating "[t]welve month services are recommended to prevent regression.  [B.B.] can learn with help but each achievement is like conquering Everest.  It would impede [B.B.]'s progress if he would have to start from scratch in September."  (Ex. H at 2.)  Ms. Steinman testified that memory is a big issue with B.B. and if he is unsupported over a summer, "we'll be setting him back a year."  (See Tr. 276-77.)  B.B.'s mother testified that she sees regression in B.B. even over the weekends when he does not get SEIT support and reinforcement of the concepts he learned in school.  (Id. 373.)  In contrast to the evidence demonstrating the necessity of a 12-month program, the Court notes that there is no affirmative evidence in the record demonstrating the appropriateness of a 10-month program or indicating that B.B. would not substantially regress.  See Antignano v. Wantagh Union Free Sch. Dist., 2010 WL 55908, at *11 (E.D.N.Y. Jan. 4, 2010) (Services for the summer months must be provided when they are a necessary element of a FAPE for the student).  It is highly significant that all of B.B.'s service providers, including the individuals who worked the most closely with him—his general education teacher, SEIT, occupational therapist, and mother—testified that he has trouble with retention, shows regression even over a

break of a few days, and that a 12-month school year program was necessary for him to obtain

an educational benefit.  (See, e.g., Tr. 196, 276-77, 373.)

The DOE points to Ms. Laine's unelaborated assertion at the IHO hearing that

there are no circumstances where a child who has made progress in a general education

classroom (i.e. a 10-month classroom) would be recommended for a 12-month school year.

(DOE Br. at 19-20 (citing Tr. 69).)  This absolutist position is shockingly suggestive of failure to

consider the needs of the individual child in formulating the IEP.  Furthermore, the record is

clear that during the time period of B.B.'s reported progress, he had one-on-one SEIT support for

25 hours per week and over a 12-month school year.  (Ex. A at 1-2; Ex. 2; Tr. 16, 18, 397.)  The

fact that a student made progress during a 10-month school year with supportive services

obviously provides no indication as to whether that same student would regress over a summer

month without support, much less any proper basis for ruling out the continued provision of

extended services.

(C)    B.B. Was Denied a FAPE

In sum, the Court finds that the Parents have proven, by a preponderance of the

evidence, that the SRO's conclusion that a 10-month school year and a 12:1:1 classroom were

sufficient to provide a FAPE was erroneous, and that the Parents have sustained their burden of

showing that the SRO erred in finding that the 2012-2013 IEP did not deprive B.B. of a FAPE.[10]

---

[10]    The Parents also contend that B.B. requires a general education setting because he
is motivated by modeling the behavior of typically developing children.  The
Parents have not met their burden of demonstrating that the IEP's failure to
provide for a general education setting resulted in a deprivation of a FAPE
because the fact that B.B. may receive motivation from emulating the students
around him does not indicate that B.B. would be unable to receive an educational
benefit outside of such a setting.  See Grim. v. Rhinebeck Central Sch. Dist., 346
F.3d 377, 397 (2d Cir. 2003) (IEP not required to "furnish[] . . . every special

III.              The Propriety of  B.B.'s Alternative Educational Program and the Balance of Equities

Having found that the 10-month school year and lack of one-on-one support services deprived B.B. of a FAPE, the Court will now consider whether the parental decision to maintain B.B. at Mirrer Yeshiva with SEIT and related services was appropriate, and the balance of equities to determine whether the Parents are entitled to reimbursement of B.B.'s educational fees.  As explained above, under the Burlington/Carter test, parents seeking retroactive tuition reimbursement from the local school district bear the burden of demonstrating that their alternative private placement was appropriate, i.e., that it was "reasonably calculated to enable the child to receive educational benefits."  S.B., 2015 WL 3919116, at *2 (citations omitted). The parents are also required to show that the equities favor reimbursement.  See id.  The Court's inquiry in this regard focuses on whether the parents obstructed or were uncooperative in the school district's efforts to meet its IDEA obligations.  See id.

The DOE does not appear to dispute, in connection with this motion practice, that the placement of B.B. at Mirrer Yeshiva for 2012-2013, with 25 hours of SEIT and related services as required by the Order of Pendency, was reasonably calculated to enable receipt of educational benefits.  (See DOE Br., Reply.)  The record, in any case, demonstrates amply that B.B.'s alternative educational program, which included SEIT and related services for a 12-month school year, was designed to address his individual needs and reasonably calculated to confer an

---

service necessary to maximize each handicapped child's potential.  Rather, the IDEA requires that the IEPs provide a 'basic floor of opportunity' . . . .") (citations omitted).

educational benefit for the 2012-2013 school year.[11]  Based on the evidence presented by the

Parents, as well as the July 2010 impartial hearing determination approving the requested

services (Tr. 16-18), the Court finds that the Parents' alternative placement was appropriate.

   A parent's claim may be denied upon a finding of a failure to cooperate with the

CSE in the development of an IEP, or if the parent's conduct precluded the CSE's ability to

develop an appropriate IEP.  See R.E., 694 F.3d at 184.  In the absence of evidence

demonstrating obstructive conduct on the part of parents, equitable considerations militate in

favor of an award of relief to parents who have been denied their rights under the IDEA.  See

C.F. ex rel. R.F. v. Dep't of Educ., 746 F.3d 68 (2d Cir. 2014).  Here, there is no evidence that

the Parents obstructed the DOE's proceedings, and the DOE has pointed to no inequitable

conduct on the part of the Parents.  The Court finds that, under these circumstances, the balance

of equities weighs in favor of the Parents, and that reimbursement of the SEIT and related

services expenses is justified.[12]

---

[11]  The DOE suggests that, because B.B. was in a general education classroom, he
was only receiving a 10-month long school year under the Parent's alternative
placement.  (See DOE Reply at 7.)  However, it is undisputed that B.B. was
receiving 12-month services in connection with his education at Mirrer Yeshiva,
(Ex. 2), and had been receiving 12-month special education and related services
for several years.  (Tr. 397.)  In their initial request for impartial hearing, the
Parents sought to maintain B.B.'s then-existing program for the 2012-2013 school
year (running from July 9, 2012 to June 30, 2013), consisting of 25 hours of SEIT
along with other services, which he receives in conjunction with a mainstream
classroom.  (Ex. A at 1-2.)  The Parents are not seeking reimbursement as to the
general education portion of B.B.'s schooling.  (Id. at n.1.)

[12]  In the Parents' original request for an impartial hearing, dated July 9, 2012 (Ex.
A), the Parents also sought reimbursement for behavioral/educational
consultations through the NYU Child Study Center (id. at 2.)  It does not appear
that the Parents are seeking reimbursement for such consultations in the instant
motion practice and the Parents have not presented evidence demonstrating the
nature of such consultations or their relevance to B.B.'s education.  Thus, to the

III.          <u>Attorney's Fees and Costs</u>

        The Parents also seek a declaration that they are the "substantially prevailing parties," and leave to submit a fee application for recovery of attorney's fees and other recoverable costs incurred in the administrative proceedings and the present action.  (Compl. 14.)  The IDEA permits a court to award reasonable attorney's fees and costs to a prevailing party in any action or proceeding brought under the statute, including administrative proceedings.  <u>See</u> <u>A.R. ex rel. R.V. v. New York City Dep't of Educ.</u>, 407 F.3d 65, 72, 75 (2d Cir. 2005).  Although the Parents did not prevail on every point they argued, they succeeded in establishing that B.B. was denied a FAPE.  The Court finds that the Parents are the substantially prevailing parties and awards them reasonable attorney's fees and costs as provided for under the IDEA.  <u>See</u> <u>B.W. ex rel. K.S. v. New York City Dep't of Educ.</u>, 716 F. Supp. 2d 336, 348 (S.D.N.Y. 2010) ("A plaintiff may be considered a prevailing party even though the relief ultimately obtained is not identical to the relief demanded in the complaint, provided the relief obtained is of the same general type." (internal quotation marks and citation omitted)).


<u>C</u><small>ONCLUSION</small>

        The Parents' motion for summary judgment is granted, and the SRO's decision is reversed.  The Parents' request for reimbursement for SEIT and related special education expenses from the DOE for the 12-month 2012-2013 year is granted.  The DOE's motion for summary judgment dismissing the Complaint is denied.

        The Parents' request for attorney's fees and costs is granted.  The Parents are

---

        extent the Parents are seeking reimbursement for the NYU Child Study Center consultations, that request is denied as lacking justification in the record.

directed to file, within 30 days of this Opinion, a motion pursuant to Federal Rule of Civil

Procedure 54(d)(2), accompanied by evidence identifying and documenting the reasonable

attorney's fees and costs they have incurred in connection with this action and the administrative

proceedings below.   Any opposition to the fee request must be filed within 14 days thereafter,

and any reply papers must be filed within 7 days after the opposition papers are filed.

        The Clerk of Court is directed to enter judgment in favor of the Parents and close

the case.

        This Opinion and Order resolves docket entry numbers 13 and 17.


        SO ORDERED.


Dated: New York, New York
      March 17, 2016

                                       /s/ Laura Taylor Swain
                                  LAURA TAYLOR SWAIN
                                  United States District Judge